IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| WILLIE JANUARY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL NO. 15-00040-CG-C |
| | ) | |
| OUTOKUMPU STAINLESS USA, | ) | |
| LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's motion for summary judgment (Doc. 26), Plaintiff's opposition thereto (Doc. 33), and Defendant's reply (Doc. 34). For the reasons explained below, the Court finds that Defendant's motion is due to be granted.

### I. Facts

This case arises from Plaintiff's employment with and termination from Defendant's facility in Calvert, Alabama.  The Complaint claims that Defendant discriminated against Plaintiff, an African-American male, on the basis of his race in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964. (Doc. 1).  The Complaint alleges that several incidents created a hostile work environment and that Plaintiff was terminated due to his race.

Plaintiff began working for ThyssenKrupp on June 22, 2008 and remained in

that job after Defendant, Outokumpu Stainless USA[1], took over the facility.  (Doc. 27-1, pp. 3-4).  The Defendant Company maintained a Code of Conduct, which Plaintiff recalls seeing in the Employee Handbook. (Doc. 27-1, pp. 47-48; Doc. 27-2, ¶ 4).  The Code of Conduct provided that use of "abusive, inflammatory, or intimidating language" or "threatening to engage in any type of physical altercation with anyone on company premises" would result in either a final written warning or termination of employment. (Doc. 27-2, pp. 10, 15).  Plaintiff was aware that engaging in threatening conduct could result in such discipline. (Doc. 27-1, p. 47).

In 2010, Darren Gates became the manager of the APL Department and Plaintiff began reporting to him. (Doc. 27-1, pp. 7-8).  Plaintiff testified that Mr. Gates never made any racial slurs or other statements that Plaintiff thought were racially offensive. (Doc. 27-1, pp. 9-10).

In early 2013, An electrician at the facility, Allen Jordan, commented to Vernon Phelps, in Plaintiff's presence, that only black people wear gold teeth and if a white employee spent too much time around the Plaintiff, he would begin wearing gold teeth also. (Doc. 27-1, pp. 127-129).  Plaintiff did not report the comment. (Doc. 27-1, p. 129).

On April 2, 2013, Plaintiff and another employee, Vernon Phelps, who is

---

[1] The complaint and docket sheet in this case reflect an incorrect spelling of the defendant's name.  In its corporate disclosure statement, (Doc. 8), the defendant noted the correct spelling for its name: Outokumpu.  The Clerk is directed to correct the docket entries to reflect the correct spelling of Defendant's name.

white, were engaged in a discussion about "people running their mouth for no reason and getting their butt beat." (Doc. 27-1, pp. 22-23). According to Plaintiff, the conversation was not racial. (Doc. 27-1, pp. 23-24; Doc. 32, ¶ 6). Mr. Phelps, unbeknownst to him, was sitting on his radio and their conversation went out over the radio. (Doc. 27-1, p. 22). Plaintiff reports that Mr. Phelps told him he was called to the office and Mr. Gates asked Phelps if he was okay. (Doc. 27-1, p. 26). Mr. Gates spoke separately with Mr. Phelps and Plaintiff about the incident and informed Plaintiff that someone had reported it to HR. (Doc. 27-1, pp. 27-28). The HR manager, Traci Nix, who is black, later spoke to Plaintiff and Mr. Phelps together about the incident. (Doc. 27-1, pp. 13, 29). Phelps and Plaintiff wrote out statements about the incident together. (Doc. 27-1, p. 28). Plaintiff told Ms. Nix that he felt like he was being railroaded and discriminated against. (Doc. 27-1, p. 33). Nix and Gates conferred about the incident and decided to place both Mr. Phelps and Plaintiff on a Final Written Warning for violating the Company's Code of Conduct, its Company's Mutual Respect policy and the core values of the Company. (Doc. 27-3, ¶ 6). On May 16, 2013, Gates presented Plaintiff with a Coaching Report/Final Warning that stated that Plaintiff had been "overheard on the radio using derogatory words and discriminating phrases." (Doc. 27-1, pp. 19-21, 30-32). Plaintiff refused to sign the document. (Doc. 27-1, pp. 19-20, 31-32). The Coaching Report stated that "[a]ny further violation of Company policy may result in termination." (Doc. 27-3, p. 7). Mr. Phelps received an identical Coaching

Report/Final Warning. (Doc. 27-2, pp. 23-24; Doc. 27-3, p. 6).  The Code of Conduct provides that such disciplinary actions "will remain active in a Team Member's file for a period of 18 months" and that "[o]nly active corrective actions will be considered in employment related decisions." (Doc. 27-2, p 11).

On August 14, 2013, Plaintiff was transferred to the Central Maintenance Department or "MTC" and began reporting to Scott Flowers, who is white.  (Doc. 27-1, pp. 10-12).  Plaintiff testified that he got along with Mr. Flowers and could not recall any times that Mr. Flowers made any racial comments or used racial slurs or other racially charged language. (Doc. 27-1, pp. 13-14).  Five or six months after transferring to MTC, Plaintiff became a Shift Leader Trainee, which was supported by Mr. Flowers. (Doc. 27-1, pp. 18, pp. 38-39).

In early 2014, Plaintiff overheard, Trey Rowland, who is a shift leader in another department, make a comment that black people will never be promoted and "need to stay in their positions and do their damn jobs." (Doc. 27-1, pp. 135-136).

In mid 2014, another employee, Jeremy Johnson, referred to Plaintiff as "black ass" and said, "you [and Mario Johnson] think that you all got it going on." (Doc. 27-1, pp. 110-111).  Plaintiff responded with "whatever" and went back to work.  The statement did not impact Plaintiff's job performance or his ability to do his job. (Doc. 27-1, pp. 111).  No one else heard the statement, but Plaintiff told Mario Johnson about it and a few days after the incident Plaintiff told Ms. Nix what

was said. (Doc. 27-1, pp. 112-114).  Ms. Nix said she would look into it. (Doc. 27-1, p. 115).

In June 2014, Jeremy Johnson asked Plaintiff why he wore gold teeth and said "only black people wore that shit." (Doc. 27-1, pp. 115-116).  Plaintiff did not respond to the comment or report it to Human Resources. (Doc. 27-1, p. 117). Plaintiff testified that he told Mario Johnson about it but does not recall when he did so or how Mario Johnson responded. (Doc. 27-1, p. 117).  Plaintiff continued working after the comment was made and admits it did not impact his job performance. (Doc. 27-1, pp. 117-118).

On another occasion, Jeremy Johnson commented on the wheels on the golf cart that Plaintiff and Mario Johnson were using as being "black" and said it was a "black thing." (Doc. 27-1, pp. 131-132).  Plaintiff did not respond to the comment and did not report it. (Doc. 27-1, p. 132).  After the comment was made, Plaintiff took a 30 min break, "drunk a soda and just sat there for a minute and thought about a few things that [he] had going on for the rest of the day" before returning to work. (Doc. 27-1, pp. 133-134).

Sometime in 2014, another employee, Mark Green, made a comment that "all black people eat bananas like monkeys." (Doc. 27-1, pp. 122, 126).  Plaintiff overheard Mr. Green make the comment to a group of maintenance workers when he walked into the meeting room where they were gathered. (Doc. 27-1, pp. 123-

5

124).  Plaintiff did not respond to the comment but resumed work, handing out work orders, and Plaintiff admits that the comment did not impact his ability to perform his job. (Doc. 27-1, pp. 124-125).  Prior to that, Mr. Green had used the term "nigger-rigging" in Plaintiff's presence. (Doc. 27-1, pp. 125-126).  Plaintiff told Mario Johnson about the comments but did not report them to Human Resources or Mr. Flowers. (Doc. 27-1, pp. 126-127).

Jimmy Garner once referred to Mario Johnson as a "black ass" when complaining about his performance as a Shift Leader and expressed that Plaintiff would be a good candidate for Mario Johnson's job. (Doc. 17-1, pp. 130-131).  On another occasion, Mr. Garner said, "I guess it's a black thing" that Mario Johnson and Plaintiff "stick together." (Doc. 27-1, pp. 131-133).  Plaintiff did not respond to the comment or report it but resumed working. (Doc. 27-1, p. 133).

On August 22, 2014, a situation arose between Plaintiff and another shift leader trainee, Stacy Bass. (Doc. 27-1, pp. 49-50).  When Plaintiff went to check on workers, he observed Angus Whetstone, an electrician, in an area other than where he had been assigned. (Doc. 27-1, pp. 53-54).  Plaintiff asked Mr. Whetstone what was going on and Whetstone replied that Mr. Bass had directed him to do another job – to answer calls and respond to them. (Doc. 27-1, pp. 54-55).  Plaintiff asked Mr. Bass about the work assignment change for Mr. Whetstone and Mr. Bass denied responsibility. (Doc. 27-1, p. 56).  Plaintiff said "somebody's lying" and, according to Plaintiff, Mr. Bass responded "fuck off, Willie January." (Doc. 27-1, pp.

6

56-58).  Plaintiff called Mario Johnson and told him about the issue with Mr. Bass and explained that the situation "had gotten a little out of hand," and that Mr. Bass told him to "fuck off." (Doc. 27-1, pp. 59-61, 74-75).  Mr. Johnson confirmed that what Plaintiff assigned Mr. Whetstone to do was the higher priority and told Plaintiff he would talk with Mr. Bass. (Doc. 27-1, pp. 60-61).  A short time later, Mr. Bass came into the office and said he wanted to talk with Plaintiff. (Doc. 27-1, p. 61).  Plaintiff told Mr. Bass that he had already spoken with Mr. Johnson about the situation and "[t]here's really nothing to talk about." (Doc. 27-1, p. 61).  Mr. Bass reportedly responded that Plaintiff was "too sensitive" and Plaintiff replied that "[he] wasn't" and got up and left the office. (Doc. 27-1, pp. 61-62).  Later that day, Plaintiff returned to the office to try to find Mr. Bass to discuss further changes of plans. (Doc. 27-1, p. 62).  Mr. Bass said, "look, the guy's trying to get me and you at each other. I didn't tell Whetstone that."  Plaintiff responded, "look, don't worry about it. It's over and done" and the two then shook hands. (Doc. 27-1, pp. 62-63). The next day, Jimmy Garner told Plaintiff he had heard that Plaintiff and Mr. Bass had an argument that was so severe that Mr. Bass had to go home. (Doc. 27-1, p. 68).  Plaintiff responded that the story Mr. Garner heard was a lie and that Mr. Bass left early to pick up his daughter (Doc. 27-1, p. 69).  Mr. Garner replied "that's not what he heard. Paper thin walls …" (Doc. 27-1, pp. 96-70).  Plaintiff was then off for a few days and returned to work on Wednesday, August 27, 2014.  That day, Mr. Bass informed Plaintiff that John had asked Mr. Bass why he did not report the

matter with Plaintiff to Human Resources and asked whether he was "alright." (Doc. 27-1, p. 77).  Mr. Bass told Plaintiff that he told Mr. Carter that he and Plaintiff had already shaken hands and there was no reason for him to take the matter to Human Resources. (Doc. 27-1, pp. 77-78).  Mario Johnson later met with Plaintiff and Mr. Bass about the incident and let them know that he had informed Mr. Flowers of it, that it had been "taken care of" and that it did not need to happen again. (Doc. 27-1, pp. 71-72).

According to Michael Carter, an investigation into the incident between Plaintiff and Mr. Bass was begun because of rumors that Plaintiff had threatened Mr. Bass and concerns expressed by other employees about what may have transpired between Plaintiff and Mr. Bass. (Doc. 27-5, ¶ 2).  Mr. Carter had recently been hired by Defendant and had assumed the role as Director of Cold Rolling Works. (Doc. 27-5, ¶ 1).  Carter reports that he conferred with Human Resources Specialist, Kelvin Nobles, who is black, about the matter and they decided to conduct an investigation. (Doc. 27-1, p. 129; Doc. 27-5, ¶ 2).  John Carter and Scott Flowers interviewed Mr. Bass and Mr. Bass provided a written statement that detailed the manner in which he alleges Plaintiff threatened him on August 22, 2014. (Doc. 27-5, ¶ 3).  Mr. Bass' statement alleged that during the incident Plaintiff said "y'all are some sorry MF" and that after Mr. Bass tried to explain the circumstances, Plaintiff threw his radio down and stood over him and said "shut your mouth MF don't say another word cause I don't want to be responsible what I

might do to you." (Doc. 27-5, pp. 9-10).  Mr. Bass reported that he then gathered his things and left. (Doc. 27-5, p. 10).

On August 28, 2014, Michael Carter, Kelvin Nobles and Scott Flowers met with Plaintiff about the incident with Mr. Bass. (Doc. 27-1, p. 83).  At the outset of the meeting Plaintiff reportedly volunteered that he had not threatened Mr. Bass. (Doc. 27-5, ¶ 4).  Michael Carter informed Plaintiff that he was being suspended for three days while the Company investigated. (Doc. 27-1, p. 82, 83).  Plaintiff provided his account of the incident. (Doc. 127-1, pp. 67, 84, 85, 160; Doc. 27-5, ¶ 5). Toward the end of the meeting, Plaintiff reportedly changed his demeanor and body language and appeared angry. (Doc. 27-5, ¶5).  According to Michael Carter, he was concerned that Plaintiff might act aggressively toward him. (Doc. 27-5, ¶ 5).

As part of the investigation, John Carter and Kelvin Nobles interviewed Jimmy Garner.  Garner said he did not witness the incident but that engaging in threatening behavior would be consistent with Plaintiff's prior behavior. (Doc. 27-5, ¶ 4).  Michael Carter, Mr. Nobles and Mr. Flowers also interviewed Jeremy Johnson. (Doc. 27-5, ¶ 7).  Jeremy Johnson also said he did not witness the incident but indicated that it would not be out of character for Plaintiff to act in a threatening and intimidating manner and that many Team Members were afraid of him.  (Doc. 27-5, ¶ 7).  Jeremy Johnson also relayed a situation in which Plaintiff threatened him and told him that he had "beaten a co-worker at his last job. (Doc. 27-5, ¶ 7).  Michael Carter and Mr. Nobles met with the Maintenance Team

Members.  During the meeting, multiple Team Members volunteered personal accounts of Plaintiff engaging in intimidating behavior and making threatening remarks. (Doc. 27-5, ¶ 8).

At the time of the incident, Mr. Bass had no active disciplinary actions in his personnel file and has never been disciplined for violating the Mutual Respect policy or engaging in threatening behavior. (Doc. 27-2, ¶ 11).  Mr. Bass had received one disciplinary action, which was a verbal coaching for attendance issues administered on or about November 20, 2012. (Doc. 27-2, ¶ 7).

On September 3, 2014, Plaintiff met Michael Carter, Mr. Flowers and Mr. Nobles and was informed that he was terminated. (Doc. 27-1, 86-87).  No one said anything that was racial in nature or offensive at the meeting. (Doc. 27-1, pp. 81, 87-88). Michael Carter made the final decision to terminate Plaintiff with input from, and the support of, Mr. Nobles and Mr. Flowers, who all believed that Plaintiff had threatened Mr. Bass. (Doc. 27-1, p. 88; Doc. 27-5, ¶ 10, Doc. 27-4, ¶ 7). Plaintiff is unaware of Michael Carter ever saying anything about Plaintiff's race. (Doc. 27-1, p. 95).  Plaintiff also states that he does not remember anybody ever saying anything to him that led him to believe that the decision to discipline him and not Mr. Bass had something to do with race. (Doc. 27-1, p. 98).  Plaintiff denies engaging in the reported threatening conduct but admits that such conduct would be prohibited by Outokumpu's Code of Conduct. (Doc. 127-1, pp. 89-91).  Plaintiff also admitted that in light of the threat Mr. Bass reported, there was nothing wrong

10

with Mr. Carter asking Mr. Bass if he was "alright." (Doc. 27-1, pp. 78-79).

On or about February 2012, the Company administered a final written warning to another employee, William "Billy" Jones, in connection with an incident where he placed a piece of tape on the locker of another employee, Corey Sutherlin, which said "try that shit again." (Doc. 27-1, pp. 106-107). Plaintiff had heard rumors and believed Mr. Jones and Mr. Sutherland were already on a final warning of some kind, but doesn't remember exactly what that was all about. (Doc. 27-1, pp. 169-170). Plaintiff has no personal knowledge of any threats or altercations involving Mr. Sutherlin and Mr. Jones or what action the Company may have taken in response. (Doc. 27-1, pp. 102-103). According to the Vice President of Human Resources, prior to February 28, 2012, Mr. Jones had never been administered formal discipline by the Company and Outokumpu is unaware of Mr. Jones ever engaging in threatening conduct or violating other policy or Code of Conduct since the February 28, 2012 final warning. (Doc. 27-2, ¶ 16). Mr. Sutherlin, who is no longer employed with the Company, was never administered formal discipline during his employment. (Doc. 27-2, ¶ 13).

## II. Plaintiff's Declaration

Defendant objects to portions of Plaintiff's declaration on the basis that they lack foundation, are not based on personal knowledge, or conflict with prior deposition testimony. An affidavit or declaration can be "used to support or oppose

a motion" as long as they are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matter stated." FED. R. CIV. P. 56(c)(4).  Additionally, an affidavit must generally set forth facts and show affirmatively how the affiant obtained personal knowledge of those facts.  See Ward v. First Federal Savings Bank, 173 F.3d 611, 617-18 (7th Cir. 1999) ("The Malkowski affidavit merely asserts that he is 'aware' of the alleged instruction by Pavlic; it does not reveal the source of Malkowski's awareness-be it a written directive from Pavlic, a conversation with him, or merely water-cooler gossip. As such, the affidavit fails to establish that Malkowski has personal knowledge on the subject of Pavlic's purported instruction."); see also 3 Am.Jur.2d Affidavits § 8 ("An affidavit must set forth facts and show affirmatively how the affiant obtained personal knowledge of those facts.").

Defendant first objects to paragraph 6 of Plaintiff's deposition in which Plaintiff states that "[t]here was nothing racial about the April 2, 2013, conversation" between him and Vernon Phelps.  Defendant asserts that this conflicts with Plaintiff's deposition testimony.  At his deposition, Plaintiff testified that the statements referred to both white and black people.  However, such testimony does not indicate that the statements were racial.  Plaintiff's statements could have simply referred to all employees, regardless of race, or if comments were made about specific employees then both black and white people were named.  In

12

fact Plaintiff testified at his deposition that there were no racial terms used in the conversation. (Doc 27-1, pp. 23-24).  The Court does not find Plaintiff's prior statements to be contradictory.

However, the Court finds that Defendant's remaining objections to Plaintiff's declaration are well founded and that those portions are due to be stricken.  Some of Plaintiff's statements consist of arguments questioning the logic of certain facts alleged by Defendant.  Plaintiff also repeatedly speculates about the feelings or beliefs of others and avers about occurrences that Plaintiff did not witness.  Plaintiff has not offered any facts to demonstrate how he obtained personal knowledge of these assertions.  Accordingly, the Court will not consider those portions of Plaintiff's Declarations because they lack foundation and are not based on personal knowledge.

## II. Discussion

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material

preclude entry of summary judgment. <u>Lofton v. Sec'y of Dep't of Children & Family Servs.</u>, 358 F.3d 804, 809 (11th Cir. 2004). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, at 249-250. (internal citations omitted).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." <u>Howard v. BP Oil Company</u>, 32 F.3d 520, 524 (11th Cir. 1994)(citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." <u>Vega v. Invsco Group, Ltd.</u>, 2011 WL 2533755, *2 (11th Cir. 2011).  In reviewing whether a non-moving party has met its burden, the Court must draw all justifiable inferences in favor of the non-moving party. <u>Tipton v. Bergrohr GMBH-Siegen</u>, 965 F.2d 994, 998 – 99 (11th Cir. 1992) (internal citations and quotations omitted).  Thus the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Liberty Lobby</u>, 477 U.S. at 251–52.

14

### B.  Plaintiff's Claims

Plaintiff claims he was subjected to a racially hostile work environment and that his termination was motivated, at least in part, by racial discrimination.

### 1. Hostile Work Environment

Defendant asserts that Plaintiff's hostile work environment claim should be dismissed because he cannot establish that he was subjected to a racially hostile work environment and cannot establish a basis for holding Defendant liable for the alleged harassment.  In his response, Plaintiff concentrates solely on his claim for discriminatory discharge and does not address Defendant's arguments with regard to his hostile work environment claim.

"In opposing a motion for summary judgment, a 'party may not rely on his pleadings to avoid judgment against him.'" Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 592 (11th Cir. 1995), cert. denied sub nom., Jones v. Resolution Trust Corp., 516 U.S. 817 (1995)(citing Ryan v. Int'l Union of Operating Eng'rs., Local 675, 794 F.2d 641, 643 (11th Cir. 1986)).  Moreover, " [t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint [or answer] but not relied upon in summary judgment are deemed abandoned." Id. at 599 (citations omitted).

The Court notes that the evidence presented also does not support hostile

15

work environment claim.  A plaintiff wishing to establish a hostile work

environment claim must show:

> (1) that he belongs to a protected group;  (2) that he has been subject to
> unwelcome harassment;  (3) that the harassment must have been
> based on a protected characteristic of the employee, such as national
> origin;  (4) that the harassment was sufficiently severe or pervasive to
> alter the terms and conditions of employment and create a
> discriminatorily abusive working environment; and (5) that the
> employer is responsible for such environment under either a theory of
> vicarious or of direct liability.

 Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (citation

omitted).  There is no dispute that Plaintiff, as an African American, is a member of

a protected group.  As to the second criteria of a prima facie case, the Court finds

that there is testimony indicating that Plaintiff has been subjected to some

unwelcome harassment.  As to the third element, the Court also finds that there is

evidence that the harassment was racially based.  However, Defendant asserts that

Plaintiff cannot establish the fourth and fifth prongs.

     With regard to the fourth element, factors to consider include "the frequency

of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance." Harris v. Forklift Sys. Inc., 510 U.S. 17, 22-

23 (1993).  An analysis of this issue was stated by the Eleventh Circuit Court of

Appeals as follows:

     To succeed at trial with her hostile environment claim Edwards must

16

demonstrate that the actions of the defendants altered the condition of the workplace, creating an objectively abusive and hostile atmosphere. Harris v. Forklift Sys., Inc., 510 U.S. 17, ----, 114 S.Ct. 367, 370-71, 126 L.Ed.2d 295 (1993) ("When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated.") (internal citations omitted).  For example, the racial slurs allegedly spoken by co-workers had to be so "commonplace, overt and denigrating that they created an atmosphere charged with racial hostility." E.E.O.C. v. Beverage Canners, Inc., 897 F.2d 1067, 1068 (11th Cir. 1990).  In deciding whether a hostile environment was created factors to consider include the frequency of the discriminatory conduct, the severity of the discriminatory conduct, whether the conduct is threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's performance at work. Harris, 510 U.S. at ----, 114 S.Ct at 372. ... A plaintiff may have a viable hostile environment claim even if the racial remarks were not directed at her. Busby, 931 F.2d at 785.

Edwards v. Wallace Community College, 49 F.3d 1517, 1521-22 (11th Cir. 1995).

Here, Plaintiff's hostile work environment is premised on only the following alleged comments:

(1) early 2013 – Allen Jordan's comment to Vernon Phelps about black people wearing gold teeth;

(2) early 2014 – Plaintiff overheard Trey Rowland comment about black people needing to stay in their positions;

(3) mid-2014 – Jeremy Johnson's "black ass" comment to Plaintiff;

(4) June 2014 – Jeremy Johnson's comment to Plaintiff about black people wearing gold teeth;

(5) Jeremy Johnson's comment about black wheels on the golf cart being a "black thing;"

(6) 2014 – Plaintiff overheard Mark Green comment that "black people

17

eat bananas like monkeys;"

(7) Mark Green's use of the term, "nigger-rigging," on two to four occasions in Plaintiff's presence;

(8) Jimmy Garner's "black ass" comment to Plaintiff about Mario Johnson; and

(9) Jimmy Garner's comment about Mario Johnson and Plaintiff sticking together being a "black thing."

These comments were made over a period of approximately 20 months by five different individuals, none of whom were members of management.  None of the comments were threatening and many were not directed at Plaintiff.  Most of the comments were not severe and Plaintiff's testimony indicates that they did not interfere with or affect his work performance.  The Court finds that the alleged harassment was not sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and create a discriminatorily abusive working environment.

### 2. Discriminatory Termination

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Section 1981 protects individuals from racial discrimination during the making and enforcing of contracts. 42 U.S.C. § 1981.  In analyzing a claim for employment

18

discrimination under § 1981, courts apply the same analysis applied to claims brought under Title VII. Phillips v. Aaron Rents, Inc., 262 F. App'x 202, 207 (11th Cir. 2008).

A plaintiff may prove discrimination by relying on either direct, circumstantial, or statistical evidence.  See Walker v. Nationsbank of Florida N.A., 53 F.3d 1548, 1555 (11th Cir. 1995).  Direct evidence is evidence which, "if believed, proves the existence of discriminatory motive 'without inference or presumption'" Hamilton v. Montgomery County Bd. of Educ., 122 F.Supp.2d 1273, 1279 (M.D. Ala. 2000) (quoting Carter v. Three Springs Residential Treatment, 132 F.3d 635, 641 (11th Cir. 1998)).  As the U.S. District Court for the Middle District of Alabama explained:

> Not only must it be evidence of discriminatory 'actions or statements of an employer' but the actions or statements at issue must 'correlate to the discrimination or retaliation complained of by the employee.' Further, the statements 'must be made by a person involved in the challenged decision' and must not be subject to varying reasonable interpretations.

Id. (quoting Lane v. Ogden Entertainment, Inc., 13 F.Supp.2d 1261, 1274 (M.D. Ala. 1998)).  No direct evidence of discrimination or retaliation has been submitted to the Court.  None of the evidence offered proves without inference or presumption that the person who made the employment decisions did so based on Plaintiff's race. Plaintiff has also not attempted to show discrimination through statistical evidence.

A plaintiff may attempt to show discrimination based on circumstantial

19

evidence through the application of the <u>McDonnell Douglas</u> burden-shifting analysis established by the Supreme Court.[2] <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Under the <u>McDonnell Douglas</u> framework, a plaintiff must first raise an inference of discrimination by establishing a <u>prima facie</u> case. <u>See</u> <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1024 (11th Cir. 2000) (citing <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1527-28 (11th Cir.1997)).

In order to make out a <u>prima facie</u> case of discrimination, a plaintiff must show:

> (1) []he is a member of a protected class; (2) []he suffered an adverse job action; (3) [his] employer treated similarly situated employees outside h[is] classification more favorably; and (4) []he was qualified to do the job.

<u>Barnes v. Crowne Investments, Inc.</u>, 391 F.Supp.2d 1108, 1115 (S.D. Ala. 2005) (citations omitted). The first prong is satisfied, as it is undisputed that Plaintiff is a member of a protected class. There is also no dispute that Defendant suffered an adverse job action by being terminated.

As to whether similarly situated employees outside his classification were treated more favorably, Plaintiff points to Defendant's failure to discipline William Jones, Corey Sutherlin and their supervisor Gates as well as Defendant's failure to discipline Stacy Bass for his interference with work orders and his part in the

---

[2] The same <u>McDonnell Douglas</u> analysis applies to both Title VII and § 1981 claims. <u>See</u> <u>Alexander v. Fulton County, Ga.</u>, 207 F.3d 1303, 1314 n. 6 (11th Cir. 2000). Therefore, the Court will discuss plaintiff's Title VII and § 1981 claims together.

dispute with Plaintiff.[3]  As happened with Plaintiff, a final written warning was issued to William Jones in February 2012, in connection with a dispute between Jones and Corey Sutherlin.  And unlike Plaintiff, Jones was never terminated. However, to be an appropriate comparator, the employee must be "similarly situated in all aspects." Holifield v. Reno, 115 F.3d 1555, 1563 (11th Cir. 1997). "The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004) (internal citations omitted).  Jones is not an appropriate comparator because there is no evidence that Jones engaged in any threats or altercations or violated a Code of Conduct after he received a final written warning.  According to the Vice President of Human Resources, Jones was not disciplined at any other time and Mr. Sutherlin did not receive a written warning and was never administered formal discipline during his employment. Plaintiff reports that he had heard rumors and believed Mr. Jones and Mr. Sutherland were already on a final warning of some kind, but doesn't remember exactly what that was all about and has no personal knowledge of any threats or

---

[3] As support for a prima facie case, Plaintiff also argues that Defendant failed to show that Plaintiff actually violated the work rule he was accused of violating. However, to establish a prima facie case Plaintiff must show there is an appropriate comparator outside his protected class that was treated more favorably.  Even if Plaintiff could show that Defendant's were mistaken in concluding that he violated the work rule, that does not show that a similarly situated employee outside of his protected class was treated more favorably.  However, the Court will address this contention later with regard to whether Defendant's stated reason for discharged is merely pretext.

altercations involving Mr. Sutherlin and Mr. Jones or what action the Company may have taken in response.  Without citing to appropriate evidence, Plaintiff also argues that Mr. Gates was involved in the dispute between Jones and Sutherlin. However, the Court finds that Plaintiff has not shown that Jones, Sutherlin or Gates are appropriate comparators as there is no evidence that Jones, Sutherlin or Gates were disciplined or should have been disciplined for conduct that occurred after a final written warning was issued or should have been issued against them.

Plaintiff's reliance on Stacy Bass as a comparator is also flawed.  Mr. Bass was not on an active final warning at the time the incident between Bass and Plaintiff occurred.  Plaintiff does not dispute that he was on a final warning and understood that misconduct during the eighteen-month period would result in termination of his employment.  Thus, Defendant correctly argues that the quantity of the misconduct was not "nearly identical" and for this reason alone, Plaintiff cannot show he was similarly situated to Mr. Bass. See e.g., Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999) (Concluding that misconduct of alleged comparators was "easily distinguished" from the plaintiff where plaintiff's disciplinary record included more policy violations).

Accordingly, the Court finds that Plaintiff has failed to provide evidence that

22

Defendant treated similarly situated employees outside h[is] classification more favorably.  Additionally, the conduct Plaintiff is alleged to have engaged in was extremely threatening behavior:  Plaintiff allegedly said "y'all are some sorry MF" and then after Mr. Bass tried to explain the circumstances, Plaintiff allegedly threw his radio down and stood over him and said "shut your mouth MF don't say another word cause I don't want to be responsible what I might do to you."  While Plaintiff contends that during their exchange, Mr. Bass stated, "fuck off Willie January" to him, such a comment, even if made, is not threatening and is certainly much less severe than the conduct attributed to Plaintiff.  For this additional reason, Plaintiff cannot properly rely on Mr. Bass as a comparator as the quality of Plaintiff's conduct is not nearly the same as that which he attributes to Mr. Bass. See e.g., Rioux v. City of Atlanta, 520 F.3d 1269, 1280-82 (11th Cir. 2008) (observing that that the "standard for similar conduct is a fairly rigorous one" and that even misconduct that is "similar to the misconduct of the disciplined plaintiff is insufficient").

Even if Plaintiff could establish a prima facie case, the Court finds that his discrimination claim would still fail.  If Plaintiff could establish a prima facie case of discrimination, the burden would then shift to the Defendant, who must "proffer a legitimate, non-discriminatory reason for the adverse employment action.  The employer's burden is exceedingly light." Hamilton, 122 F.Supp.2d at 1280 (quoting Meeks v. Computer Assoc. Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994) (internal

quotations omitted)).  In this case, Defendant has clearly met its burden of proffering a legitimate, non-discriminatory reason for firing Plaintiff – Michael Carter made the final decision to terminate Plaintiff with input from, and the support of, Mr. Nobles and Mr. Flowers, who all believed that Plaintiff had threatened Mr. Bass in violation of the Code of Conduct while there was an active final warning in Plaintiff's file.

Once the Defendant proffers a legitimate reason for the employment decisions, the burden then shifts back to Plaintiff, who must show that the employer's proffered reasons are pretextual, or merely a cover for discrimination. Id. "At the pretext stage, in order to survive summary judgment, Plaintiff must provide sufficient evidence to allow a reasonable fact finder to conclude, at a minimum, that the proffered reasons were not actually the motivation for the employer's decision." Miller v. Bed, Bath & Beyond, Inc., 185 F.Supp.2d 1253, 1270 (N.D. Ala. 2002) (citing Combs, 106 F.3d at 1538.  Plaintiff may do this "(1) by showing that the employer's legitimate nondiscriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, a discriminatory reason more likely motivated the decision." Id. (citations omitted).  "This is done by pointing to 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons . . . that a reasonable factfinder could find them unworthy of credence.'" Hamilton, 122 F. Supp.2d at 1281 (quoting Combs, 106 F.3d at 1539).  The ultimate burden of persuasion remains with the plaintiff at

all times in cases involving merely circumstantial evidence. <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

In satisfying the ultimate burden of proving that the adverse employment action was on account of race, a plaintiff need not establish that race was the sole reason for the action, but that it was a determinative factor in the employer's decision. <u>See</u> <u>Anderson v. Savage Laboratories, Inc.</u>, 675 F.2d 1221, 1224 (11th Cir. 1982) (citing <u>Haring v. CPC International, Inc.</u>, 664 F.2d 1234, 1239-40 (5th Cir. 1981)).  However, it should be noted that federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions." <u>Chapman</u>, 229 F.3d at 1030 (quoting <u>Elrod v. Sears, Roebuck & Co.</u>, 939 F.2d 1466, 1470 (11th Cir. 1991)).  It is not appropriate for either the Plaintiff or this Court to "recast an employer's proffered non-discriminatory reasons or substitute his business judgment for that of the employer." <u>Chapman</u>, 229 F.3d at 1030.

In the instance case, Plaintiff is unaware of the decision maker, Michael Carter, ever saying anything about Plaintiff's race.  Plaintiff also states that he does not remember anybody ever saying anything to him that led him to believe that the decision to discipline him and not Mr. Bass had something to do with race.  Plaintiff denies engaging in the reported threatening conduct, but admits that such conduct would be prohibited by Outokumpu's Code of Conduct.  Even if Plaintiff could show that Defendant was mistaken because Plaintiff did not engage in the alleged threatening behavior, a mistake in fact does not show pretext.  <u>See</u> <u>Lee v. GTE Fla.</u>,

Inc., 226 F.3d 1249, 1253 (11th Cir.2000) (providing that "[a] plaintiff must show not merely that the defendant's employment decisions were mistaken, but that they were in fact motivated by [the protected characteristic]"); Alexander v. Fulton County, Ga., 207 F.3d 1303, 1339 (11th Cir.2000) (holding that "[a] plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race.") overruled on other grounds, Manders v. Lee, 338 F.3d 1304 (11th Cir. 2003).  Similarly, if Defendant was mistaken in its assessment of the prior incident that resulted in Plaintiff being put on final warning, that mistake would also not show pretext.  "[W]hether an employment decision was prudent or fair is irrelevant. Hudson v. Blue Cross Blue Shield of Alabama, 431 Fed.Appx. 868, 869 (11th Cir. 2011) (citing Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir.2002) and Elrod, 939 F.2d at 1470 (noting courts do not reexamine an employer's business judgment and that the key inquiry is "whether the employer gave an honest explanation of its behavior")).  Defendant investigated the incident between Plaintiff and Mr. Bass and believed that Plaintiff had engaged in the threatening behavior.  While Plaintiff contends that some of the employees Defendant interviewed during its investigation were racially motivated, it is clear that Defendant attempted to conduct a thorough investigation and obtain Plaintiff's side of the story before making a decision.  The decision maker did not simply follow the recommendation of someone who was biased without investigating the

complaint.[4]  As such, the Court finds that Defendant has proffered legitimate non-discriminatory reasons for its decisions and Plaintiff has not shown that the proffered reasons are pretextual.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment (Doc. 26) is **GRANTED**.

**DONE** and **ORDERED** this 28th day of July, 2016.

/s/ Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE

---

[4] Through a cat's paw theory, a plaintiff may establish that the discriminatory animus of a non-decision-maker actually caused the decision to terminate the plaintiff. See Stimpson v. City of Tuscaloosa, 186 F. 3d 1328, 1331-32 (11th Cir. 1999).  However, to do so, the plaintiff must show that the decision-maker "followed the biased recommendation without independently investigating the complaint against the employee." Id. at 1332.